Stand, please. Oyez. Oyez. Oyez. All persons having business before the Honorable, the United States Court of Appeals, for the District of Columbia Circuit, are admonished to draw near and give their attention, for the Court is now sitting.           Oyez. Oyez. Oyez. Oyez. Oyez. Oyez. Oyez. Oyez. Oyez. Oyez. Oyez. Oyez. Please be seated, please. Case number 17-5123, Association of American Railroads vs. United States Department of Transportation et al. Appellates. Mr. Nemiroff for the appellates, Mr. Dupri for the accepting. Mr. Nemiroff. May it please the Court. Patrick Nemiroff on behalf of the government. This Court's prior due process holding in this case had three necessary conclusions. First, that Amtrak is self-interested. Second, that the metrics and standards had regulatory effect. And third, that the FRA's role in developing the metrics and standards did not cure the due process concerns. Now that third conclusion was necessary because, as the Court recognized, due process allows for even purely private, self-interested entities to be involved in the rulemaking process as long as a neutral government entity ultimately has authority to prevent the issuance of any unfair rule. The Court held that the FRA's role here was insufficient because of subsection 207D's arbitration provision. The Court reasoned that, had the FRA and Amtrak been unable to agree to metrics and standards, that dispute would have been resolved by the arbitrator, who the Court held would have been unconstitutionally appointed and who might have sided with Amtrak, thus undermining the FRA's authority. But that problem is resolved by severing subsection 207D from the statute. Without the arbitration provision, section 207 would resemble schemes allowing for the joint issuance of rules by neutral and self-interested entities that the Supreme Court upheld in Curran, Sunshine, Anthracite, and Rock Royal. The statute would also be operational without the arbitration provision, and it would continue to serve Congress's interests in enacting PREA. The Supreme Court, of course, has directed that, in considering constitutional claims, courts should uphold as much of a statute as possible, and consistent with that direction, this Court should sever subsection 207D, uphold the rest of section 207, and allow Amtrak and the FRA to issue new metrics and standards. I just want to make sure I'm understanding how these metrics and standards affect freight railroad to begin with. Sure. So if I tell you my understanding, please tell me where I'm wrong, if it's wrong. And that is, these metrics and standards apply to, they're performance standards and metrics for Amtrak. That's right. On time, clean stations, these types of things. And they don't regulate, in that regard, the freight railroads. But if Amtrak is found to have failed some of those metrics, then the Surface Transportation Board may choose to investigate. And if they choose to investigate, and if they discover that the cause is freight railroad not seating track, or anything else, I'm not sure, then there could be an investigation of the freight railroads. Is that the only potential impact on them? Because you keep talking about regulating the freight railroads, and I'm trying to understand that. Right. There's that, and there's one other aspect, which I can explain. And before I do, even the prior opinion did find that they had some regulatory effect. But even that opinion recognized that it was uncertain the extent to which they could directly affect freight railroads. So, as Your Honor explained, there is the potential to trigger these STB adjudications. But ultimately, any finding in an STB adjudication, a negative finding for a freight railroad, would be because of a violation of the separate statutory preference requirement, which has long been a part of the scheme. So, not because of a violation of the metrics and standards. The second aspect is that the statute directs Amtrak and the freight railroads, to the extent practicable, to incorporate the metrics and standards into operating agreements that are negotiated between the Amtrak and the freight railroads. Right. So, that's a negotiation. And if the sides were unable to agree, ultimately the STB would have authority to prescribe reasonable terms. I just, I don't get. So, it's one thing to say, all right, so in a mutual agreement, it will sort of make clear what Amtrak's performance expectations are. But you just now said something about direct regulation. I'm still having trouble understanding what direct regulation is. To be clear, we certainly agree with Your Honor that the metrics and standards do not directly regulate the freight railroads. It's at most an indirect effect. And that further supports our argument that the statute would be constitutional without subsection 207D. Once you remove that arbitration provision, the statute is directly analogous to the schemes in Kern and Rock Royal, where a neutral government entity jointly issued rules with a self-interested entity. And in fact, in those cases, the rules clearly had binding effects. So, in Rock Royal, it was minimum milk prices that milk handlers had to pay to milk producers. Here, as Your Honor pointed out, the metrics and standards don't have the same direct regulatory effect. So, if anything, that just supports our argument that the scheme would be constitutional without that arbitration provision. So, your basic argument is that, is it what the panel, the panel failed to do a severability analysis, and that that's the defect, right? Well, I wouldn't call it a defect. The issue simply wasn't before the court. But, you know, all of your arguments so far, your responses to Judge Millett and your analysis about why the panel should have done a severability analysis or sent it back to the district court to do that, is a very powerful argument for why the panel decision is wrong. But, was it the time to have corrected that with a petition for a re-hearing on bank? In other words, this panel is, just like the district court, bound even by wrong decisions, aren't we? Yes, Your Honor. But our argument is that severability wasn't even before the panel when it issued its prior opinion. And to see that, I think what's important to remember is that the district court order on review had upheld the statute as constitutional in its entirety, had upheld the metrics and standards. So, and we've cited a number of cases that show that in that posture, when you're on appeal from that sort of order, you know, the government ordinarily doesn't have to raise severability arguments, and if the court... But why would the panel have, normally, I would understand your severability argument if the panel had invalidated D, and the question was, could it be severed? But it invalidated A, B, and C. So, I'm not even sure how severability fits into, how this case even fits into normal severability analysis. Well, I think it's... Why would the panel have even, why would it have even occurred to them to do it? They thought, the panel thought, the panel thought after 10 pages of analysis that 207 violated due process, and that's my point. I don't understand severability here. The issue that was before the panel really was whether the metrics and standards themselves should be upheld or invalidated, and there's no doubt that the panel's opinion required invalidation of the metrics and standards. But severability is a separate question, it's a remedial question that most naturally comes up after a constitutional violation has actually been identified. So at the point that the appeal was before the court, severability wasn't an issue because the statute had been upheld as constitutional. Now, once the court identified a constitutional violation, the next step, of course, is that remedial step. The fact that the court didn't say anything about severability doesn't foreclose the issue. But if a panel is going to declare a law unconstitutional, doesn't it have an obligation on its own to consider severability or at least remand it to the district court? Declaring a law unconstitutional is a big deal. It's hard for me to imagine that a panel would not consider severability simply because someone didn't raise it. Precisely because severability is so fundamental to constitutional analysis, the court should not lightly infer that the panel decided the issue. One way to think about this... But I still don't understand why anybody would think about severability in the context of this case, since it had declared all of 207 unconstitutional. It didn't declare anything unconstitutional, it just reversed the district court's opinion and said that because the PRIIA grants this power, economically interested Amtrak and to an unconstitutionally appointed arbitrator, it transgresses the vital guarantee. We don't know what and means. Normally and means both. So it doesn't mean or, it means and. And so your argument is that the panel said that the 207 as constituted was unconstitutional because of both reasons. And your argument is the first reason doesn't continue once you eliminate the second. That's exactly right, Your Honor. And the fact that the court simply reversed the grant of summary judgment to the government is telling. In silence, the fact that it didn't direct the district court to do something on remand, I don't think should preclude the district court. Normally, or often, we direct the district court to issue an order vacating 207. It didn't do that. Exactly. And it was still left. And it did not do that. So the truth is, we don't know what the panel intended in that respect. Right, and I think an important, one way to think about this is, if Congress tomorrow passed a statute that was identical to Section 207, but omitted the arbitration provision, the court's prior opinion wouldn't control completely, it wouldn't determine that that statute was unconstitutional. Of course, it would control much of the analysis, but there would still be an open question, whether the FRA's role, now that the arbitration provision is not part of the scheme, solved the... Chief Justice Garland's question gets to just some ambiguity in the prior panel opinion. Now, the Supreme Court has been quite clear in instructing that if a court has a narrow way and a broad way to go in a constitutional ruling, it is bound, as a matter of constitutional avoidance and the separation of powers that reflects, to go narrow, not broad. So should, is that, are you proposing that as a rule of interpretation for a prior panel if we're unclear, if there's ambiguity, should we assume they did, assuming it's sufficient to dispose of the case as their constitutional duty, they went narrow rather than broad? That's absolutely right, Your Honor. I mean, the court's obligation, as the Supreme Court has made clear, is to invalidate as little of a statute as possible. So where a court is simply silent on the issue, it should not be inferred that the court therefore intended to preclude separability analysis. Of course it was left to the district court to enter a judgment as it, as required by the court's opinion. And everyone agrees that the district court was correct to invalidate the metrics and standards. That judgment needed to be issued. But then there's a next question, which is whether the FRA and Amtrak can issue metrics and standards going forward once the statute has been severed in some respect. And that issue simply wasn't addressed by the prior opinion. It was left open to the district court to address it. It's on the severability question. But as I understand the government's position, you don't regard the panel as ambiguous with respect to why it decided substantive due process here, right? That's right. You regard the substantive due process argument as one based on the fact that the agency was on FRA, was unable to provide a check because of the appointment of an arbitrary. That's the way you read the panel decision in at least two places, right? That's right. So that's not, you know, it's ambiguous panel and we should adopt some rule of construction of our own panels. It's that your reading of the prior panel is that its basis was on the existence of the arbitrator. And if you remove the arbitrator, then as you point out, if you thought about a separate case with a new statute, it would be constitutional. Is that right? That's right. The opinion's reasoning clearly indicates that the statute would be constitutional without the arbitration provision. And you can see that by going through pages 34 and 35 of the opinion. The court first addresses whether Carter-Cole applies despite the fact that Amtrak is a government entity. It holds that it does, but it immediately has that footnote that recognizes that the holding of Carter-Cole was limited by Curran and Sunshine Anthracite because those cases held that the joint participation of a neutral government entity can cure the due process concern. And the only basis the court gave for distinguishing those cases was the arbitration provision. Then, directly after the footnote on page 35 in the text of the opinion, the court addressed the government's argument, the same substantive point that the FRA's involvement in the development of the metrics and standards addressed the due process concern. And again, the court explained that because of the arbitration provision, the FRA would be unable to hold the line against Amtrak's self-interest. So, it's clear from that reasoning that once you take out the arbitration provision, FRA's role would cure the due process concerns the court identified in the prior opinion. I have no additional points I want to make at this time. If I can reserve the rest of my time for Rebella. Of course, unless we have questions. Thank you. Good morning. May it please the court. Tom Dupree on behalf of the Association of American Railroads. The government is asking this court to effectively reverse the prior panel's decision. The prior panel held that the grant of rulemaking authority to Amtrak was not constitutional. That's right. Rulemaking authority. But it doesn't have any rulemaking authority after the arbitration clause is removed. Can you explain how it does? Well, it does, Your Honor. How is that? Well, in other words, even absent the arbitration clause, the statute would provide that the FRA and Amtrak shall jointly issue the metrics and standards. Well, that means that unless the FRA agrees, it doesn't issue metrics and standards. Isn't that right? I think that's fair if the FRA doesn't agree, but I don't think that there's anything in the prior panel's decision that suggests that that scheme would be constitutional. In fact, do you – let me just read you parts of the opinion and tell me why they don't. The principal point of the opinion is that giving a self-interested entity regulatory authority – the arbitrator is no longer there. Amtrak no longer has regulatory authority because the FRA has to approve. Isn't that right? I don't think that's right, Your Honor. That's what I want to know why. Okay. Because it is a joint rulemaking scheme. In other words, Amtrak and the FRA would each be vested with 50 percent authority to issue the rules. But the rule can't be issued unless the FRA agrees. Amtrak on its own can't issue the rule, right? That's true. But the problem is, is that even in that scheme where there's joint co-sharing authority, you are still going to have Amtrak's bias present in the rule that issues. In other words, it's not as though – Maybe. Or the FRA can just not issue any metrics at all. Well, for one thing, the statute says that Amtrak and the FRA shall issue. So, I'm not – Well, that's very nice. But if it also says both have to agree, we have to read that as a whole. What do you think it means? What do you think happens if the FRA does not – says no and Amtrak says yes? You can't issue it anyway. Well, I think one of two things would happen. Either the parties would compromise because both are operating under a statutory mandate to issue these regulations within a time certain. If that didn't happen, no rule would issue. Right. But the point is, is that the cases that the government is relying on to suggest that this sort of extraordinary and, frankly, unprecedented power-sharing approach is constitutional, the cases that the government relies on are plainly distinguishable. And in footnote 4 and on page 35 of the prior panel's opinion, to be sure, the court notes the presence of the arbitration provision as one way to distinguish these cases. It's the only way in footnote 4. Isn't that right? In footnote 4 it says those cases are inapplicable here because the FRA's authority to hold the line against overreaching by Amtrak is undermined by the power of the arbitrator. That is the only reason in footnote 4, isn't it? In footnote 4, yes, but I would direct – That's where you directed me to, footnote 4, Omri. And page 35. And on page 35 it says, moreover, FRA is powerless to overrule Amtrak. As joint developers, they occupy positions of equal authority. When there is intractable disagreement, the matter is resolved by an arbitrator who may ultimately choose to side with Amtrak. FRA cannot keep Amtrak's naked self-interest in check, and therefore the requirement of joint development does not sanitize the act. Right, but Your Honor read the second part of the paragraph. The first part of the paragraph, before the portion Your Honor read, says that it is far from clear whether and in what way FRA checks Amtrak. Both are subdivisions within the same branch and work in tandem to effectuate the goals Congress has set. Nowhere in the scheme is there any suggestion that FRA must safeguard the freight operator's interests or constrain Amtrak's profit pursuits. Moreover, FRA is powerless to – I read you the second part. Right. Read it again. So it doesn't say that both of those two reasons that are independently sufficient for the court's judgment. It lists both of them, and the first reason it gives, it's not clear. So it's not clear to me that the issue is anything other than the failure or the inability of FRA to check here. Well, Your Honor, I don't think, in all fairness, I don't think it's a plausible reading of the prior panel's opinion to say that they devoted 10 pages in the Federal Reporter to explaining why the grant of rulemaking authority, absent the arbitration clause, just the grant of rulemaking authority violates due process and then effectively unwrite everything they did in a sentence in a footnote where all they did was distinguish these two cases that the government hadn't even cited in the brief. These are Supreme Court opinions that were distinguished, and if the only reason they gave for distinguishing those Supreme Court opinions is no longer less, then we are stuck with the Supreme Court opinions. We don't have a rule that says don't pay any attention to our footnotes. We do have a rule that says don't pay any attention to your footnotes, but we don't have that rule with respect to our own. Your Honor, I think that the court's, the prior panel's ultimate decision, the mandate in this case, as Judge Tatel noted, was to strike down Section 207 in its entirety. The government conceded that point in the district court. They told Judge Boasberg. They said yes. The D.C. Circuit struck down 207 in its entirety. The government throughout the five years this case has been litigated, both in two prior appeals to this Court, one to the U.S. Supreme Court, has never asserted that the statute was severable. Even when we said in Arbery's the statute was severable. As the Court knows, this Court has an independent obligation to assess severability. It did not assess severability. It did not in any sense suggest that there was more to do vis-a-vis severability. In fact, it directed Congress to do it. It did not direct the elimination of the section. It didn't say no severability. It could have easily have said that as well. It's a difficult problem because the Court says that the freight operators failed to preserve their arbitration claim at all, and yet they let you raise the claim. So it's a little much to claim that the government should have thought that the Court was going to allow you to raise the arbitration claim, and then having raised the arbitration claim ruled against you, and then have to argue severability. The arbitration claim was raised both in the prior appeals to this Court and the Supreme Court. I think what the prior panel was saying was that in our original complaint, you know, five or six years ago, we didn't raise it. But by the time the relevant moment came for the government to argue severability, either in the prior appeal to this Court or in the Supreme Court, the arbitration provision, as the prior panel noted, had been fully briefed on the merits. This wasn't a surprise. It had been briefed, but it wasn't preserved. They let you out of that problem. We don't generally have a rule that says you can come up with a tax on statutes that you don't put into the complaint. This was not in the complaint at all. Well, again, Your Honor, I think with respect, the prior panel has decided that the arbitration claim was in the complaint. It has been fully litigated in the last three or four iterations of this lawsuit. In all those iterations, when we were fully briefing and arguing arbitration, we were arguing no severability. The government never said anything to the contrary. The government said it was winning. And when you're winning, you don't have to raise the severability claim. It did. And their request to the Supreme Court was to overturn your position. It wasn't to sever your position. It was to overturn it, and the Supreme Court did. So not clear why. And just again, I'm just going to read you again what the prior panel said. The freight operators failed to preserve their arbitration clause claim. They never so much as hinted at this argument until the first brief filed in our court. The court does not say it was really hidden in your complaint somewhere. It says we're going to let you do it anyway, basically because the court thinks it's an important argument. But that's not a reason why we should take away from the government the ability to raise severability. We have an obligation to preserve congressional statutes if they're constitutional and to not throw the whole thing out. That's what the Supreme Court has told us. That's what we said in our own copyright royalty tribunal case. But this court, as the panel knows, this court has an independent obligation to assess severability. And the court's traditional practice, as all the parties acknowledge, is either to address severabilities, it does in many cases itself, or if it thinks that a portion of the statute may be sustained, it would remand to the district court to conduct the severability analysis. Given the importance of the sort of constitutional command to us to go narrow, if we can, if the opinion is silent, it doesn't undertake a severability analysis. Why should we assume? It doesn't do it either way. What should we assume from the silence? Why doesn't the constitutional command assume that it either wasn't decided or was decided narrowly? Because in a typical severability case, Your Honor, there is a portion of a statute which is deemed unconstitutional, and that's the focus of the court's opinion. And the severability inquiry then looks at whether a separate portion of the statute that was not declared unconstitutional can nonetheless survive. In this case, the panel devoted ten extensive pages to explaining why 207A, the grant of rulemaking power, was unconstitutional. I submit there's no plausible... Well, as Chief Judge Garland said, what empowered that rulemaking power to be unconstitutional was that there was no governmental intermediation, like there was in the other cases. And why? Because the arbitration provision took that away. So if there is still a colorable, plausible severability argument to be made and the opinion is absolutely silent, I don't understand why constitutional principles would forbid us from just assuming they went as broad as possible and took the whole thing down. Well, because I don't think that the premise, the first part of Your Honor's question accurately reflects the opinion. I don't think it's a fair reading of the prior panel's decision to say that the only due process flaw in this statute was the arbitration clause. I think that ignores the first 10 to 15 pages of the opinion. Related to that, could you just say once again, what's your clearest answer to Chief Judge Garland's question that he asked you 10 minutes ago, namely that without the arbitration clause, no regulation can issue without the affirmative support of the FRA? Right. Right. Do you disagree with that? I disagree. In other words, without the arbitration clause, there's no constitutional infirmity in the statute. And that's wrong. That's why I asked you the question. Tell me again why it's wrong. Right. It's wrong because, first of all, it does not fit the model of the cases that the government says the statute, shorn of the arbitration provision. No, but just this statute. His question was about this statute. His question to you was, without the arbitrator, isn't the due process problem resolved because Amtrak on its own can't issue any regulations that bind its competitors? But the due process problem is not solved, Your Honor. And the reason why is because Amtrak would still have 50% of the authority and that the end product of the regulations would necessarily be a compromise between a bond. Okay. So, but if there is no, if the FRA refuses, it can't issue, correct? Because it has 50%, right? That's right. If the FRA refuses, yes. So your argument then is that, well, because it's 50-50, they'll compromise, right? And, therefore, the Amtrak's role will, in terms of its competition with its competitors, will be, that that will be the due process problem because it has the ability to force or to encourage the FRA to compromise, right? That's right. Because I think what the FRA, excuse me. But still, at bottom, you agree, right, that if the FRA doesn't want to compromise, then the regulation will not issue, correct? If the FRA doesn't want to compromise, the regulation will not issue. But what I would say, Your Honor. is that it remains unconstitutional because Amtrak, a nongovernmental agency, has influence over how the federal agency might decide what to do. It's a co-equal with the federal agency. I certainly think if this Court were confronting a statute that vested, say, the Department of Defense and Raytheon with equal legislating authority, that there would be a constitutional problem with that, particularly if added to that statute was the requirement you have here, which is to say you shall issue regulations within a time certain. I think there is a statute. How would that be compelled? You would come in and say, actually, we want this set of metrics. It shall be issued. And the two sides would say, well, I'm sorry, we don't agree. How would this ever be compelled, this word shall in the example you're giving? Well, I would say, Your Honor, if that's a problem, that would suggest the statute can't be severed along those lines because the statute is not workable. Well, or it would suggest shall doesn't always mean absolutely must. But I think that government actors, as all do, they act in good faith. And if they are given a congressional command from Congress that you shall issue this, I think a typical good-faith government agency would seek to issue something, even if it means compromising. Well, they wouldn't typically, a good-faith government agency, wouldn't seek to issue something that wasn't in the public interest, which is its obligation. So there's lots of regulatory compromise. There was an entire theory of administrative law based on NEGREG, negotiated regulations, where there's negotiations between the regulated industry and the agency. And in the end, the agency tries to come up with a regulation that industry agrees with. The fact that there's influence from the agency and that the agency tries to accommodate industry doesn't make these things unconstitutional. We have never identified a statute, and the government has never identified a statute, that gives 50-50 power sharing. Is it really 50-50? I mean, the Supreme Court was pretty clear that in issuing these metrics and standards, Amtrak acts as a governmental entity. Now, the prior panel was concerned that with the arbitration provision in its pocket, its naked self-interest would empower it to override that. But if that's gone, it doesn't have that in its pocket, don't we have to assume that, at least to some degree, Amtrak will act as the Supreme Court said it would, as a governmental entity, pursuing governmental ends and setting its metrics and standards? But I don't think what the Supreme Court did not say, that just because Amtrak must be treated as a governmental entity, that therefore it is not self-interested, that it doesn't have a profit motive. That's Congress's judgment. That's the public good in Congress's view is that they make money. But the Supreme Court was quite clear that when it comes to issuing metrics and standards, they act as a governmental entity. So I'm not sure it's 50-50. How is it 50-50 if they're also at least imbued with a governmental aspect? Because it's 50-50 in the sense that it is a system where you have one, quote-unquote, pure government entity, and you have another entity that is a for-profit government corporation. And what the prior panel said at length is that the fact that Amtrak must be treated as governmental doesn't make it appropriate in a due process context for it to regulate its competitors because it is motivated by profit. It is not regulating in some larger public interest untainted by its profit motive pursuits. That's what the prior panel held. I would also point out that the government filed a rehearing petition in this case. It never mentioned severability even after this panel had acted. This court has said in many contexts that an issue is waived if it's something that could have been raised in the prior appeal and wasn't. There is absolutely no reason why the government could not have raised it. Is severability really waivable? I mean, you know, if someone brought a challenge to a teeny-tiny provision in the huge tax act that was just adopted and then didn't bother to argue severability, would the court have no choice but to take the entire statute down? I think we have our own obligation to invoke it, do we not? Yes, I agree with that, but at the same time, the prior court had the same issue. The prior panel had the exact same issue, and you're absolutely right. That court had an obligation to act in the narrowest possible way, and the fact that it didn't do what this court almost invariably does, either do severability itself or remand with instructions to conduct severability, I think leads to no other conclusion than it determined the statute was not severable. Our job is not to psychoanalyze the prior panel. Our job is to decide what the prior panel actually decided. It clearly did not decide severability expressly one way or the other. You may say it impliedly decided that. That's also not our job. Our job is to determine what the panel actually said, and it didn't say anything about severability. Judge Millett's point, which is that even if the government made a mistake here, the consequence of the mistake can't—that is, even if the executive branch made a mistake here, the consequence can't be that we have to take down a congressional statute, unless, of course, it's actually unconstitutional. But now we're on the question of whether we can even consider severability. It would be something if the government could fail to defend a congressional statute, maybe even malevolently fail to defend a congressional statute, and its lack of defense would require us to strike down Congress's work. Well, first, I would say that we cite in our brief half a dozen cases where courts of appeals have said that severability, like any non-jurisdictional argument, can be waived even when it's the government. Wouldn't you agree waiver is the wrong word here? I know that the courts have been using this, but ever since Justice Scalia's opinion at Nolano, isn't the correct word forfeiture here? Forfeiture might be a better way of putting it, but— Forfeiture is, as we have said, as Justice Scalia said, as Judge Williams said, in his opinion on the subject of law of case, this is prudential. This is not jurisdictional. And we have the authority to determine whether, even in face of the government's forfeiture, the issue ought to be decided. And when we have a situation, as Judge Millett described, this is the most significant thing we ever do, the judicial branch ever does, is strike down a congressional statute. We need to hesitate and consider a severability analysis. We can't just say it was impliedly decided. Your Honor, what I would say is I would say that you don't need to— to rule in our favor, you don't need to say anything was impliedly decided. All Your Honor has to do is look at page 35 of the prior panel opinion, when before getting to the point Your Honor read to me from the bench, they give additional reasons why the involvement of the FRA in this scheme didn't salvage the statute. At the end of that paragraph, you are right. They do go on to say, oh, and moreover, by the way— They don't say, oh, and moreover. They say, moreover. Fair enough. It was a rhetorical embellishment on my part. But they did say moreover. And then they provided an additional reason. And so I think that to say that the due process flaw, the only due process flaw, was the arbitration provision I respectfully submit is not a fair reading of what this panel decided. This case comes to this Court on a motion for entry of judgment. We respectfully submit that it is not a fair memorialization of the decision of the prior panel striking down 207 in its entirety, a point the government has conceded to memorialize that decision in something that says, well, you know, it's actually constitutional. Thank you. Further questions? Thank you. Government has more time. Thank you, Your Honors. My opposing counsel still has not identified a persuasive reason why the statute would be unconstitutional once the arbitration provision is removed. Without the arbitration provision, the FRA would have unfettered authority to prevent the issuance of any unfair rule. That's not quite fair to them. They said the panel gave a list of reasons, only one of which was the arbitrator. And the other problem is that the FRA doesn't protect freight operators or isn't charged with constraining Amtrak's avaricious profit motives. So that language on page 35 I think is best read as premised on the arbitration provision, not as an independent basis to hold the statute unconstitutional. And we know that because if you go back and look at Curran and Sunshine Anthracite, which the Court immediately cited immediately before that discussion, the mutual government entity there also did not have a directive to safeguard the other private entities' interests. In fact, if you look at Rock Royal, there the Secretary of Agriculture was directed to issue minimum milk prices that could be approved by milk producers over the objection of milk handlers who had to pay the price. And the statute stated that those orders were intended to benefit the milk producers. So the Secretary of Agriculture actually had a directive to benefit the same party that could approve the prices over the objection of another government entity. So it was actually on the other end. There certainly wasn't a requirement that the government entity have a mandate to oppose the private party that is involved in the regulatory process. And here, once you take away the arbitration provision, there's also the fact that Amtrak is not a private entity. It's a government entity, as the Supreme Court held, not an unaccountable actor, and that the metrics and standards do not have direct regulatory effect on the freight railroads, unlike the orders at issue in those other cases. So once you take the arbitration provision, the scheme certainly compares favorably to those schemes that have been upheld, and there is no longer any due process problem. Now I'm happy to answer any other questions the Court may have. Otherwise, thank you. I take the matter under submission. Thank you all.
judges: Garland, Tatel, Millett